UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JEANNE B. BRYANT, solely in her capacity as court-appointed Independent Fiduciary for RETIREMENT SECURITY PLAN AND TRUST, | Case No. 1:13-cv-298-BLW |
| | MEMORANDUM DECISION AND ORDER |
| Plaintiff, | |
| v. | |
| COLONIAL SURETY COMPANY, a Pennsylvania Corporation, | |
| Defendant. | |

## INTRODUCTION

Pending before the Court is Plaintiff Jeanne Bryant's Motion to Amend to Add Punitive Damage Claim. Dkt. 53. The motion is fully briefed and at issue. For the foregoing reasons, the Court will deny the motion.

## FACTUAL BACKGROUND

In 2007, Colonial Surety Company ("CSC") first provided an ERISA Fidelity Bond to Retirement Security Plan and Trust ("RSPT"). *Pl.'s Brief*, Dkt. 53-1, p. 2. RSPT is a multiple-employer retirement plan, of which Plaintiff Jeanne Bryant is the court-appointed fiduciary. Dkt. 55-2, p. 2. In October of 2010, RSPT sought to renew the

existing ERISA Fidelity Bond, which insured RSPT against any loss arising from

"fraudulent or dishonest acts" performed by its then-fiduciary, Matthew D. Hutcheson.

*Id*. In response to RSPT's renewal application, CSC issued Bond 2R890238E (the

"Bond") with a bond term of October 13, 2010 to October 13, 2011, and a maximum

amount of liability of $500,000.00.[1]  *Id*.

Not only was Hutcheson RSPT's Plan Trustee, at all relevant times, he also owned

or controlled the majority of shares in Green Valley Holdings, LLC ("GVH"). On

October 10, 2010, GVH issued a promissory note to RSPT for $3.5 million ("RSPT-GVH

Note"), and thereafter GVH and RSPT entered into a Pledge and Security Agreement

("PSA"). Pursuant to the PSA, RSPT agreed to provide financing to GVH in exchange

for a pledge of all of GVH's assets. In accordance with the PSA, on December 23 and 27,

2010, Hutcheson directed RSPT to transfer $3,276,000.00 to GVH. *Id*. at p. 3.  With this

money, GVH purchased a promissory note held by Pacific Continental Bank ("PCB

Note"). *Id*. GVH later defaulted on the RSPT-GVH Note, and RSPT thereafter became

the owner of the PCB Note, which contains the right of foreclosure over the golf course

and lodge located at Tamarack Resort in Tamarack, Idaho.[2]

---

[1] CSC argues that the Bond did not provide coverage to RSPT, but rather to a non-existent entity known as the "Matthew D. Hutcheson LLC Retirement Security Plan and Trust." This factual dispute was one of several that led the Court to deny the parties' respective motions for summary judgment on August 20, 2015. *See* Dkt. 65. Thus, whether RSPT is the named insured on the Bond remains an outstanding issue of fact.

[2] CSC explains that RSPT has enforced its rights as the owner of the PCB Note, which resulted in a stipulated judgment whereby RSPT was declared the sole owner of the PCB Note with a "valid and (Continued)

**Memorandum Decision and Order - 2**

After transferring the $3,276,000.00 to GVH, Hutcheson tried to conceal the transaction from Monty Walker, an administrator of RSPT. Walker believed that the PCB Note was in fact a RSPT investment—not a GVH investment. Dkt. 55-2, p. 5. But in August of 2011, Walker began to suspect that something was awry with the PCB investment and he sent a letter to Hutcheson outlining his concerns. *Id*. Hutcheson ignored the letter.

On October 13, 2011, the Bond expired and RSPT submitted an application to renew it. Dkt. 55-2, p. 8. In the renewal application, RSPT—through Hutcheson—sought an increase in Bond coverage from $500,000.00 to $1,000,000.00. Upon receiving RSPT's renewal application, CSC sought additional financial information from RSPT. At the time, RSPT was being audited in conjunction with its annual Department of Labor reporting requirements. As soon as the audit report ("Audit Report") was completed, a copy was provided to CSC on or around November 28, 2011. *Id*. Among other things, the Audit Report disclosed Hutcheson's acts in transferring $3,276,000.00 from RSPT to GVH and described those acts as a "prohibited transaction." *Id*. Soon after receiving the

---

perfected lien and security interest" in the golf course and lodge. RSPT also received a judgment in its favor against West Mountain Golf in an approximate amount of $5,630,000, plus interest. A sheriff's sale of the property at issue was ordered; however, it has not yet occurred. Bryant alleges that the golf course property may not actually have significant value to RSPT. Dkt. 59-1, p. 5.

Additionally, on November 3, 2014, RSPT received an offer to purchase the PCB Note for $6,000,000.00. RSPT's counter-offer was rejected and the potential buyer did not further pursue the purchase. *Id*.; Dkt. 55-2, p. 11.

**Memorandum Decision and Order - 3**

Audit Report, or even on the same day it received the Audit Report, CSC chose not to renew the Bond. Dkt. 53-1, p. 4; Dkt. 64, p. 7. CSC notified RSPT of the non-renewal via a letter dated December 7, 2011. *Id*. CSC indicated that RSPT's application was denied because RSPT had misrepresented in its application the amount of assets it held, and because RSPT had requested $1,000,000.00 in coverage when it purported to only hold $500,000.00 in assets. Dkt. 55-2, p. 9.

Hutcheson was later tried and convicted in Idaho district court of wire fraud, which included the $3,276,000.00 transfer to GVH. *Id*.; see Case No. 12-cr-93-WFN. Judgment in that case was entered on July 31, 2013. It is the transfer of $3,276,000.00 by Hutcheson from RSPT to GVH, a prohibited transaction under ERISA, which provides the basis for RSPT's claim for coverage under the Bond.

Prior to Hutcheson's conviction, on May 2, 2012, Walker submitted a written notice of a claim under the Bond to CSC. Dkt. 55-2, p. 9. A copy of Hutcheson's criminal indictment was enclosed with the letter. Dkt. 59-1, p. 6. CSC denied the claim on July 16, 2012. Dkt. 55-2, p. 9.

Bryant filed suit against CSC asserting claims of breach of contract and bad faith for denying RSPT's claim of coverage. On June 19, 2015, Bryant filed a motion for partial summary judgment and CSC filed its own motion for summary judgment. Finding numerous genuine issues of material fact, the Court denied both motions August 20, 2015. At that time, the Court also heard argument on the pending Motion and ultimately took that matter under advisement. Additional briefing was requested, which was provided to the Court on August 26, 2015.

**Memorandum Decision and Order - 4**

# ANALYSIS

Whether a party should be allowed to amend a pleading to seek punitive damages is a substantive question controlled by Idaho law. *See Windsor v. Guarantee Trust Life Ins. Co.*, 684 F.Supp. 630, 633 (D.Idaho 1988). Ultimately, an award of punitive damages requires a bad act and a bad state of mind. *See Todd v. Sullivan Const. LLC*, 146 Idaho 118, 123, 191 P.3d 196, 201 (Id.Sup.Ct.2008). The defendant must (1) act in a manner that was an extreme deviation from reasonable standards of conduct with an understanding of—or disregard for—the likely consequences, and must (2) act with an extremely harmful state of mind, described variously as with malice, oppression, fraud, or outrageousness.[3] *Myers v. Workmen's Auto Ins. Co.*, 140 Idaho 495, 501, 95 P.3d 977, 983 (Id.Sup.Ct.2004); *see also* I.C. § 6-1604.

At trial, the party alleging punitive damages must satisfy this standard by clear and convincing evidence. *See* I.C. § 6-1604(1). However, for purposes of the motion to amend, the party seeking to add a claim for punitive damages does not need to meet this high burden; rather, the party need only show "a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages." *See* I.C. § 6–1604(2). Therefore, although Federal Rule of Civil Procedure 15(a) encourages the trial court to liberally grant motions to amend pleadings, this policy is substantially tempered by the

---

[3] The Idaho Supreme Court has recognized that since the enactment of I.C. § 6-1604(1) in 1987, gross negligence or deliberate or willful conduct is not sufficient for an award of punitive damages. *See Cummings v. Stephens*, 157 Idaho 348, 336 P.3d 281, 296, n. 5 (Id.Sup.Ct.2014).

requirements under Idaho law. That is, a plaintiff may amend its complaint to assert a claim for punitive damages only if it establishes a reasonable likelihood of proving, by clear and convincing evidence, that defendant's conduct was oppressive, fraudulent, malicious, or outrageous.[4]  Since the plaintiff is only required to establish a "reasonable likelihood" of establishing her entitlement to punitive damages, the Court concludes that, on a motion to amend under Idaho Code § 6-1604(2)  it should apply the same standard it would apply in resolving a Rule 50 motion at the close of the plaintiff's case.  In short, the evidence must be viewed in light most favorable to Bryant, and she must be given benefit of all legitimate inferences without assessing credibility. *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir.2009).

The Idaho Court of Appeals has identified five factors that may assist a court in determining whether there is sufficient evidence to support a punitive damages award: (1) whether the unreasonable conduct actually caused harm to the party seeking punitive damages; (2) the presence of expert testimony; (3) whether there is a special relationship between the parties; (4) proof of a continuing course of oppressive conduct; and (5) proof of the actor's knowledge of the likely consequences of the conduct. S*ee Cuddy Mountain*

---

[4] Bryant argues that the Court should assess only the evidence she put forth within her Motion, and not examine any of the evidence submitted by CSC. *Pl.'s Supp. Br.*, Dkt. 67, p. 4. But the plain language of Idaho Code § 6-1604 belies that interpretation. That provisions states: "The court shall allow the motion to amend the pleadings if, *after weighing the evidence presented*, the court concludes that, the moving party has established . . . a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages." I.C.  6-1604 (emphasis added). Thus, the relevant statute indicates that the Court should examine *all* of the evidence presented, including the evidence put forth by the non-moving party. If the Court were to look only at Bryant's evidence, there would be no "weighing" involved.

*Concrete Inc. v. Citadel Constr. Inc.*, 121 Idaho 220, 229–230, 824 P.2d 151, 160–61 (Id.Ct.App.1992). The Court will evaluate Bryant's Motion in light of the foregoing standards.

### 1.  Whether the Unreasonable Conduct Actually Caused Harm

#### a.  <u>Unreasonable Conduct</u>

In support of her claim for punitive damages, Bryant points to a number of actions by CSC that support RSPT's claim for punitive damages: (1) CSC learned that a claim was going to be made on the Bond and chose not the renew the Bond to avoid paying the claim; (2) certain provisions within the Bond, taken together, allow CSC to continually sell policies without ever paying a claim; (3) RSPT requested an extended discovery period, which CSC was bound to honor; and (4) CSC's summary denial of RSPT's claim—done without any investigation into the merits of the claim—was an extreme deviation from claim handling procedures. Without resolving the merits of CSC's denial of coverage, the Court will examine each allegation in turn.

First, as evidence that CSC learned a coverable claim was going to be made on the Bond, and chose not to renew the Bond to avoid paying that claim, Bryant points to the Audit Report, which was provided to CSC on or around November 28, 2011. *Id*. The Audit Report provides:

NOTE 9 – PROHIBITED TRANSACTION

On October 10, 2010 the Plan Trustee executed a promissory note receivable with Green Valley Holdings, LLC in the amount of $3,500,000. Under the terms of the agreement, during December 2010, the Plan Trustee directed the advance and transfer of $3,276,000. The actions taken by the Plan Trustee were independent of and occurred without the knowledge of

> any other direct party or fiduciary associated with the Plan. Green Valley
> Holdings LLC is an entity owned the Plan Trustee which causes the actions
> of the Plan Trustee to result in a prohibited transaction.

Dkt. 53-2, p. 41. Bryant claims that CSC was effectively put on notice—via the above language—that a claim under the Bond was forthcoming, and that CSC chose not to renew the Bond for that reason. On the same day CSC received the Audit Report, or shortly thereafter,[5] CSC decided not to renew the Bond. This decision was communicated to RSPT via a December 7, 2011 letter. Dkt. 53-1, p. 4. The December 7, 2011 letter listed the reason for non-renewal as "Company's Option." Dkt. 53-1, p. 53.

Even assuming that CSC chose not to renew the Bond because it became aware that a prohibited transaction had taken place during the Bond's term, such a decision would not give rise to a claim for punitive damages unless RSPT was somehow entitled to renew the Bond. But RSPT had no such entitlement. By the Bond's plain terms, it expired on October 13, 2011. As of November 28, 2011—after the expiration of the Bond—CSC may have been put on notice that a prohibited transaction had occurred in late December of 2010, but it also would have been aware that no notice or claim was ever made while the Bond was in effect. The Court cannot conclude that CSC acted

---

[5] While RSPT insists that CSC decided not to renew the Bond the very same day it received the Audit Report, the record does not establish that proposition with certainty. In support of that contention, RSPT cites to deposition testimony from Wayne Nunziata, CSC's 30(b)(6) deponent, as well as Exhibit 11 attached to the affidavit of Bryant's counsel. Neither source cited conclusively establishes that CSC made the decision to not renew the Bond the same day it received the Audit Report.

fraudulently or maliciously by choosing not to renew the Bond, when it was under no obligation to do so.

Second, Bryant alleges that certain provisions within the Bond, taken together, allow CSC to continually sell policies without ever paying a claim. The Bond ostensibly provides coverage against any loss which RSPT incurs through any "fraudulent or dishonest act or acts" committed by Hutcheson. Dkt. 55-10, p. 1; 16-1, p. 2. It is the definition of "fraudulent or dishonest act" that Bryant takes issue with. The Bond defines a "fraudulent or dishonest act" as follows:

> A fraudulent or dishonest act of an Employee of the Insured shall mean an act which is punishable under the Criminal Code in the jurisdiction within which act occurred, for which said Employee named in the attached schedule is tried and convicted by a court of proper jurisdiction.

Id. at § 5 (emphasis added). By the Bond's plain language a fraudulent or dishonest act requires a conviction by a court of proper jurisdiction. Unambiguously—but problematically as discussed below—there cannot be a fraudulent act under the Bond without the covered employee being tried and convicted.

The Court agrees with Bryant that the definition of "fraudulent or dishonest act" is problematic for a number of reasons; namely, it permits CSC to eat its cake and have it too. For example, if a claim was made—as CSC contends it should have been made here—when the acts giving rise to an eventual conviction were discovered, then CSC could deny the claim because no "fraudulent or dishonest act" as defined in the Bond has yet occurred, since there would be no conviction at that time. If, however, the insured waited until an actual conviction arose before making a claim, CSC could then complain,

as it does here, that it did not receive proper notice and deny the claim based on that ground. Requiring a conviction before a "fraudulent or dishonest act" may occur could indeed be the result of an intentional scheme on the part of CSC to limit the number of claims it pays out; or, it may simply be the result of poor drafting. RSPT has not pointed to any evidence that would allow the Court to conclude one way or the other. Something more than the plain language of the Bond is needed.

While the Court acknowledges the Catch-22 that *could* arise from the Bond's plain language, in actuality, CSC never relied on the definition of "fraudulent or dishonest act" in denying RSPT's claim. Instead, CSC's rationale for denying the claim was three-fold: the Bond expired on October 13, 2011, the Bond only covers losses discovered prior to its expiration, and notice must be given no more than fifteen days after discovery. *Schwartz Dec*., Ex. BB. Had RSPT submitted a timely claim and CSC denied it because Hutcheson had not been convicted yet, the Court would be inclined to agree with RSPT. But as it stands, the Court concludes that CSC could not have acted maliciously in simply having this particular definition of "fraudulent or dishonest act" in the Bond, without trying to take advantage of its incongruity.

Third, Bryant alleges that the Bond itself recognizes "that RSPT requested an extended discovery period, which CSC was bound to honor." Pl's Mem., Dkt. 53-1, p. 9. The Bond states in relevant part:

> Insured has the right to purchase an additional discovery period of one year in the event of termination or cancellation and, the Insured has already given the Company notice that it desires such discovery period.

Bond, Dkt. 55-10; 16-1, § 3. Bryant argues that when the claim was made within that extended discovery period, CSC denied coverage based "almost exclusively on the termination of the policy." *Id*. p. 10.

The Court is unpersuaded. Having the *right to purchase* is not the same thing as *actually having purchased* an additional discovery period. The Bond references only the former. Bryant has not established that RSPT did in fact purchase an additional discovery period, but only that it desired to do so. Accordingly, it cannot be said that CSC acted maliciously in failing to honor an additional discovery period that was never purchased.

Finally, Bryant asserts that CSC's summary denial of RSPT's claim—done without any investigation into the merits of the claim—was an extreme deviation from claim handling procedures. Bryant has not supported this claim with expert testimony or other evidence. Without more evidence, the Court is not convinced that such practice constitutes a deviation from reasonable claim handling procedures so extreme as to warrant a claim of punitive damages.

### b. Actual Harm

Bryant contends that as a result of CSC's denial of coverage, RSPT has suffered the loss of the Bond limit, or $500,000.00. In response, CSC notes that the denial of coverage did not cause any harm above and beyond the harm imposed by CSC's denial of the claim itself. Dkt. 61, p. 19. And indeed, Bryant has not pointed to any additional harm. *See Crandall v. Hartford Cas. Ins. Co*., 2012 WL 851102, *4 (D. Idaho Mar. 12, 2012) ("Here, it cannot be said that Hartford Casualty's allegedly unreasonable conduct actually caused harm to Plaintiff, above and beyond the harm imposed by Hartford

Casualty's denial of the claim itself.") Even the harm incurred by the denial itself appears to be tempered by the fact that RSPT still holds the PCB Note as an asset.

When looking at whether the unreasonable conduct actually caused harm, the Court concludes that this factor weighs against granting the Motion.

### 2.  Special Relationship

Idaho law acknowledges a special relationship between the insurer and insured that requires the parties to deal in good faith. *See Cuddy,* 824 P.2d at 160–61. Here though, CSC argues that RSPT was not the named insured. The Court denied summary judgment based in part on this factual dispute. Accordingly, a jury will need to decide whether RSPT was the named insured and this factor does not weigh in favor of either party.

### 3.  Expert Testimony

Bryant's Motion is not supported by any expert testimony. Bryant argues that no expert testimony is required. Dkt. 64, p. 9. It may be true that expert testimony is not necessary to prove punitive damages at trial. However, supporting a motion to add a punitive damages claim with expert testimony allows a court to more easily conclude that the moving party has a reasonable likelihood of meeting its burden at trial. Accordingly, the lack of expert testimony weighs against granting the Motion.

### 4.  Continuing Course of Oppressive Conduct

Much of CSC's conduct has been discussed above, but to summarize those facts, construed in a light most favorable to Bryant: (1) CSC foresaw that a claim would be made and chose not to renew RSPT's Bond to avoid paying that claim; (2) CSC routinely

issues policies that it knows no entity will be able to collect on; and (3) CSC unreasonably denied RSPT's claim without properly investigating it. Assuming the absolute truth of these assertions, CSC did engage in continuing course of oppressive conduct. But at this stage, the Court cannot simply take Bryant at her word.

The problem for Bryant lies in the relatively minimal evidence she has provided to support her claims, and the wealth of evidence and argument that CSC provides in response. Bryant can support her claims with, primarily, the plain language of the Bond itself, and the temporal proximity between CSC receiving the Audit Report and denying RSPT's renewal application. There is simply no direct evidence of malice. Moreover, these two pieces of evidence are not sufficient for the Court to infer malice on the part of CSC, particularly in light of CSC's claim that it refused to renew RSPT's Bond because RSPT misrepresented its assets within the renewal application and requested an additional $500,000.00 in coverage.[6]

After weighing both Bryant's and CSC's evidence, the Court concludes that Bryant has not established a reasonable likelihood that she can establish CSC engaged in a continuous course of oppressive conduct.

### 5. Knowledge of Likely Consequences

---

[6] Bryant does not dispute that the assets listed in RSPT's renewal application were incorrect; rather, she argues that as early as October 2008, CSC knew that RSPT's plan assets were in access of $19,000,000.00—not $500,000.00 as reported.

Regarding the knowledge of likely consequences, as the insurance company, CSC is in a superior position and understands the important financial consequences of denying a claim. *See White v. Unigard Mut. Ins. Co.,* 112 Idaho 94, 730 P.2d 1014, 1018 (Idaho 1986). This is particularly true in cases where, as here, CSC's denial impacts numerous individuals and their retirement plans, since Hutcheson wrongfully removed large portions of individual retirement plans to facilitate the transfer to GVH. In both first-party and third-party insurance situations the "contract and the nature of the relationship give the insurer an almost adjudicatory responsibility." *Id.* Generally, the insurer is responsible for evaluating the claim, determining whether the claim falls within the coverage provided, and determines whether to settle or litigate based on the merits. *Id.* "Although the insured is not without remedies if he disagrees with the insurer, the very invocation of those remedies detracts significantly from the protection or security which was the object of the transaction." *Id.* Therefore, in insurer/insured cases, there is a presumption that the insurance company has knowledge of the probable consequences of its actions. *See id.* Here however, it is unclear whether this presumption should apply since there is still a question of fact as to who the named insured on the Bond is. Accordingly, this factor is neutral.

### 6.  Weighing All Factors

On the record before the Court, whether to grant the Motion is a close call. Bryant has primarily relied on two pieces of evidence in support of her claim: (1) the language of the Bond, which requires a conviction before there can be a covered "fraudulent or

dishonest act"; and (2) the timing of CSC's denial of RSPT's renewal application, allegedly rendered the same day that CSC received the 2011 Auditor Report and with it, notice that a "prohibited transaction" had been made. This evidence, taken together, is certainly sufficient to raise suspicions, but is not enough to demonstrate the requisite malice on the part of CSC.  Even assuming that RSPT was the named insured and that the special relationship and knowledge of likely consequences factors weigh in Bryant's favor, the other three factors do not. On the whole, the Court finds that the *Cuddy Mountain* factors weigh against allowing the amendment. Accordingly, Bryant's motion is denied.

## ORDER

In accordance with the Memorandum Decision set forth above, NOW THEREFORE IT IS HEREBY ORDERED:

1.     Plaintiff's Motion to Amend/Correct Complaint to Add Claim for Punitive Damages (Dkt. 53) is **DENIED**.

2.     Plaintiff's counsel shall contact In-Court Deputy Jamie Bracke at (208) 334-9021 within one week following receipt of this order to make arrangements for a telephonic scheduling conference between counsel and the Court in which the trial date and pretrial conference shall be set.



DATED: February 22, 2016

_____
B. Lynn Winmill
Chief Judge
United States District Court